## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | CASE NO: 23-90757 |
| STRUDEL HOLDINGS LLC, *et al.*, | § | |
| | § | CHAPTER 11 |
| Debtors. | § | |
| | § | |
| AVR AH LLC, *et al.*, | § | |
| | § | |
| v. | § | ADVERSARY NO. 23-09003 |
| | § | |
| NINETEEN77 CAPITAL SOLUTIONS | § | |
| A LP, *et al.*, | § | |
| | § | |
| Defendants. | § | |
| | § | |

## AMENDED MEMORANDUM DECISION AND ORDER*

This case is about the relationship between a sophisticated borrower and sophisticated lenders. And, under New York law, if the lenders waited too long to foreclose on collateral. The borrower, Charif Souki is well-known in the liquified natural gas industry. In 2016, he cofounded Tellurian, Inc. to, among other things, construct an LNG facility in Louisiana. Souki borrowed about $120 million secured by valuable assets—including an 800-acre ranch outside of Aspen, Colorado, his luxury racing yacht, and his 25 million shares in Tellurian. The Tellurian LNG project—referred to as the Driftwood Project—had great promise. If it reached what is known as final investment decision ("**FID**"), his shares would be worth hundreds of millions of dollars.

Tellurian's potential to achieve FID was not unfounded. Before Tellurian, Souki cofounded Cheniere Energy and achieved great success. But this time Souki defaulted on his loans before Driftwood reached FID. This started several years of negotiating and renegotiating with his lenders. He wanted to work with them, and they wanted to work with him.

Between March and May 2022, the Tellurian shares reached a value that, if sold, could have repaid the debt in full. But that didn't occur for many reasons. By the time the lenders foreclosed on the collateral, the Tellurian share price had declined, and the ranch couldn't be sold for a price sufficient to cover Souki's debt either. Souki and related guarantors remained liable for at least $100 million.

* Reflecting non-substantive changes on pages 26 and 29.

Souki and the other Plaintiffs first sued the lenders and related parties in New York state court alleging, among other things, the disposition of the Tellurian shares was not commercially reasonable under applicable New York law. The Debtors later filed chapter 11 cases in this District. Plaintiffs then started this Adversary Proceeding against the defendants, who are referred in this Memorandum Decision and Order as the "**Secured Parties**."

As in the New York action, Plaintiffs mainly allege that the Secured Parties did not dispose of the Tellurian shares and Souki's luxury yacht in a commercially reasonable manner. They also believe the Secured Parties destroyed the value of the ranch. Plaintiffs seek a declaration that would eliminate the outstanding loan debt, plus damages against the Secured Parties for about $100 million. The Secured Parties disagree strongly and countered with claims of their own.

Based on the evidence and applicable law, the Secured Parties acted in good faith and were commercially reasonable manner in every aspect of disposing the collateral. So Plaintiffs lose on all their claims. The Court also finds that the lenders are still owed at least $100 million in damages. All other claims brought by either party fail.

## Background[1]

Souki is the sole owner of the Debtors. In 2016, he cofounded Tellurian and started the Driftwood Project. Souki bought land in Louisiana to construct an LNG facility and contributed it to Tellurian in exchange for 50 million shares of Tellurian.[2] He kept 25 million shares and donated 20 million shares to the Souki Family 2016 Trust ("**Trust**"). Souki's children are trustees and beneficiaries of the Trust.[3] The last 5 million shares were donated to charities.[4]

Souki borrowed $50 million under a Loan Agreement dated as of April 27, 2017 ("**2017 Loan**"). The Debtors and the Trust guaranteed the 2017 Loan. Nineteen77 Capital Solutions A LP and Bermudez Mutari, LTD ("**Lenders**") are the lenders, Wilmington Trust National Association ("**Wilmington**") is the Administrative Agent, and UBS O'Connor LLC ("**O'Connor**") is the investment advisor.[5] O'Connor is the private credit arm of UBS's asset management group. It specializes in lending to high-net-worth individuals.[6] The Lenders, Wilmington, and

---

[1] Plaintiffs' exhibits ("PL. Ex.") are at ECF No. 121 and the Secured Parties' exhibits ("SP. Ex.") are at ECF No. 119. Trial transcripts (ECF Nos. 125–128) are referred to as Tr. 1–Tr. 4. Some of the conclusions listed here are factual determinations, and others are legal conclusions. Factual and legal conclusions shall be treated as such, regardless of how they are labeled.

[2] Tr. 1 330:6–15.

[3] Tr. 1 131:2–8.

[4] Tr. 1 330:12–15.

[5] Tr. 2 123:20–124:25, 159:21–160:7; SP. Ex. 113.

[6] Tr. 2 123:14–19.

O'Connor are the Secured Parties. Souki, the Debtors, and the Trust also executed a Pledge Agreement, dated as of April 27, 2017 ("**2017 Pledge Agreement**").[7] Debtor AVR AH LLC ("**AVR**") also executed a deed of trust related to the Loan.

The Lenders provided Souki an additional $70 million under a Loan Agreement dated as of March 30, 2018 ("**2018 Loan**").[8] The Debtors and the Trust guaranteed the Loan. A related Souki entity named Ajax Cayman also guaranteed the 2018 Loan. Wilmington is the Administrative Agent and O'Connor is the investment advisor.[9] AVR executed a deed of trust related to the 2018 Loan. The parties also executed a related pledge agreement ("**2018 Pledge Agreement**," and with the 2017 Pledge Agreement, the "**Pledge Agreements**").[10]

The maturity date on both Loans was eventually extended to May 2020.

The "**Collateral**" pledged to secure the Loans included:[11]

- 25 million shares of Tellurian stock owned by Souki ("**Souki Shares**");

- an 800-acre "Ranch" outside of Aspen, Colorado owned by AVR. Alpine Bank (an unrelated party here) held a $30 million first lien on the Ranch and the Secured Parties held the second lien;[12]

- Souki's equity interests in AVR;

- the equity interests in Ajax Holdings, LLC (50% owned by Debtor Strudel and 50% by the Trust); and

- the equity interests in Ajax Cayman, which owned a luxury racing yacht named the Tango.[13] The Tango was built by Wally.[14] Souki bought it in 2018 for $17 million or €15 million at the time.[15]

O'Connor signed the Loans as an investment advisor, but it is not a party to either of them. As investment advisor, it participated in important decisions about the Collateral.[16] Baxter Wasson, the co-head of O'Connor Capital Solutions, is one of the two voting members involved in material decisions about the Loans.[17]

---

[7] SP. Ex. 110.
[8] SP. Ex. 379.
[9] Tr. 2 123:20–124:25, 159:21–160:7; SP. Ex. 379.
[10] SP. Ex. 107.
[11] A more complete description of the Collateral is at SP. Exs. 107 and 110.
[12] Tr. 1 101:22–23; Tr. 2 281:7–13, 294:17–295:25.
[13] Tr. 1 81:22–82:5.
[14] Wally makes luxury yachts.
[15] Tr. 2 79:23–80:19.
[16] Tr. 2 126:5–24.
[17] Tr. 3 401:18–403:21.

O'Connor's investment team included Randal Johnson, a managing director, and Lilly Kaufman, a director.

In March 2018, Souki and the Lenders executed an account control agreement ("**Control Agreement**").[18] The Control Agreement provided that once a notice of control was issued, O'Connor could take control over the account holding the Souki Shares. Any sale of these Shares would require O'Connor's consent.[19]

By May 2020, Souki still had not repaid the Loans. So the parties entered a bridge agreement for each Loan ("**Bridge Agreements**").[20] The Secured Parties agreed to forbear from exercising remedies under the Loans, the Pledge Agreements, and deeds of trust until the earlier of either a "Termination Event" occurred or March 30, 2021.[21] The Bridge Agreements also provided that:

- the borrowers acknowledged several events of default and that all obligations under the Loans were due and payable; [22]

- after the forbearance period expired, Wilmington could foreclose upon or dispose of any Collateral at any time provided that Wilmington and the Lenders used commercially reasonable efforts to avoid material disruption in Tellurian's stock price.[23]

- Souki covenanted to accept an offer on the Ranch for at least $90 million by September 15, 2020, consummate a sale by December 15, 2020, and apply all the net proceeds to prepayment of the Loans.[24]

On the same day the parties executed the Bridge Agreements, O'Connor delivered a notice of control triggering its rights under the Control Agreement.[25]

Things remained stable for a time but then got complicated. In September 2020, Ajax and AVR, as borrowers, executed a promissory note with Souki's brother for about $6.6 million ("**September 2020 Note**").[26] More on this Note later.

As for the outstanding debt under the Loans, the Bridge Agreements expired in March 2021 and Souki had not repaid the debt. He also failed to meet the milestone requiring him to sell the Ranch for $90 million.[27] Rather than exercising

---

[18] SP. Ex. 383, ECF No. 123-3.
[19] Tr. 1 81:22–25, 98:2–7; Tr. 2 135:5–11; SP. Ex. 383.
[20] Tr. 2 20:13–25; SP. Ex. 106; SP. Ex. 114.
[21] Tr. 2 22:23–23:1; SP. Ex. 106; SP. Ex. 114.
[22] Tr. 2 128:4–7; SP. Ex. 106; SP. Ex. 114.
[23] *See* SP. Exs. 106 and 114 at § 4.3(a).
[24] Tr. 2 22:5–14.
[25] Tr. 2 135:1–8; PL. Ex. 4.
[26] Tr. 1 299:17–300:9; SP. Ex. 60.
[27] Tr. 1 350:1–10.

their rights, the Secured Parties continued to work with Souki and shifted their focus to selling the Ranch.[28] The Loans were also put on non-accrual status.[29]

The parties agreed to market the Ranch in parcels, which included developed and undeveloped lots.[30] The lots included homesteads and common areas. Souki and his children stayed in separate luxurious homes on the Ranch during the COVID-19 pandemic.[31] Because Souki pivoted to selling the Ranch in parcels, the family set up an HOA.[32] Souki's son Christopher was a broker at Coldwell Banker realtors. Christopher and Souki's other son—Karim—led the marketing efforts in 2021. They started a luxury rental program to attract potential buyers and show that costs associated with the HOA could be mitigated by renting out the homes.[33]

While Souki's sons marketed the Ranch, O'Connor and Souki—negotiating often through Karim—continued negotiating around a delayed sale of the Souki Shares to minimize disruption to the share price. Karim and O'Connor representatives also exchanged proposals about extending the Bridge Agreements and how to allocate the proceeds from the Ranch sales between the Secured Parties, Alpine, and the HOA.[34]

Tellurian reaching FID remained important to the parties because it had significant upside in the long-run and could lead to a complete repayment of all debt obligations without liquidating other Collateral. During this time, Souki was still working to achieve FID. Karim stressed that Souki should be the one to sell the Shares because a premature sale would hurt Driftwood. In April 2021, Karim proposed a forbearance agreement protecting Tellurian by prohibiting O'Connor from selling the Shares for 12 months until Tellurian reached FID for the Driftwood facility. Karim stressed that Tellurian was "about to sign several contracts" and a "premature sale of his shares, during [an] initial increase in stock price" would "derail the entire process."[35]

A few months later, Karim proposed to O'Connor that Souki "will be ready to propose an orderly sale of shares in the second quarter of 2022 to repay any remaining balance."[36] And again he stressed "[a]ny premature sales on [Souki's]

---

[28] Tr. 2 291:17–21, 294:10–16.
[29] Tr. 2 251:24–253:2.
[30] Tr. 1 98:9–99:5; Tr. 2 294:10–16.
[31] Tr. 1 83:9–18.
[32] Tr. 1 100:6–11.
[33] Tr. 1 105:13–21.
[34] *See, e.g.*, PL. Ex. 78; PL. Ex. 53; SP. Ex. 381; SP. Ex. 148.
[35] Tr. 1 203:15–204:16; SP. Ex. 124.
[36] Tr. 1 212:23–213:6; SP. Ex. 148.

part, or by O'Connor on his behalf, prior to his implementation of the rest of his strategy, would have a catastrophic impact on the share price."[37]

In October 2021, Karim proposed yet another forbearance. This time it was a term sheet providing that "beginning June 1, 2022," Souki "will arrange for the sale of Tellurian Shares, either via a 10 B 5, block sale or other methodology, to satisfy whatever remaining balance exists within 12 months of that June 1st, 2022 date."[38] He also sent an email at the end of the month, reminding the Lenders that Tellurian "has a lot of positive momentum that needs to be encouraged."[39] The body of the email contained an article that stated Morgan Stanley estimated that upon FID, Tellurian's price target was $22 during mid-2022.[40]

Ultimately, three homesteads on the Ranch were sold between August and October 2021 for about $46.5 million in the aggregate.[41] Alpine was paid off, and the Secured Parties moved into first lien position. [42] And about $12 million from the sale proceeds was used to pay down the Loans.[43]

By March 2022, Souki remained in default under the Loans and the Bridge Agreements. The parties continued to discuss proposals about selling the Ranch parcels and a future date to sell the Souki Shares.[44] Karim continued to stress that a premature sale of the Shares would hurt Tellurian and that Souki had to be the one to sell the Shares.[45]

At the same time, between March and May 2022, the stock price of Tellurian was rising compared to past months, and Tellurian was making progress towards FID. On March 28, Tellurian issued a press release that Bechtel Energy received a limited notice to proceed with construction of the first phase of Driftwood.[46] Johnson circulated the press release to O'Connor's investment team.[47] On April 1, 2022, the stock closed above $6/share.[48] On April 14, 2022, the stock closed at $6.19/share.[49] On April 29, 2022, the stock closed at $4.98/share.[50] On May 26, the stock closed at

---

[37] Tr. 1 212:9–14; SP. Ex. 148.
[38] Tr. 1 216:4–9; SP. Ex. 120.
[39] Tr. 1 219:13–15; SP. Ex. 35.
[40] SP. Ex. 35.
[41] Tr. 1 118:11–120:4; PL. Ex. 66; PL. Ex. 72.
[42] Tr. 2 295:10–20.
[43] Tr. 2 295:10–12.
[44] *See, e.g.,* Tr. 2 317:1–17; SP. Ex. 136.
[45] Tr. 2 319:17–320:12; SP. Ex. 136.
[46] PL. Ex. 102.
[47] Tr. 2 232:15–25.
[48] PL. Ex. 261.
[49] PL. Ex. 261.
[50] PL. Ex. 261.

$4.61/share.[51] A sale of the Souki Shares during this period would have paid off the Loans.

But FID was still the objective. Souki believed he was "blacked out" under securities laws from selling the Shares. So, he proposed a five-step plan to the Secured Parties in May 2022. The plan included that on or before September 30, 2022, he "sell a block of stock to generate enough money to discharge $62.6MM plus a 6% accrued interest from June 30th unless [he was] restricted under the company's guidelines."[52] But he stressed that it was "critical that [he] be the one to sell the shares in a manner and at a time that it does not hurt the company. Not doing so would destroy the value of the collateral and would cause enormous damage to all involved."[53] The proposal also contemplated $25 million of third-party financing that would have paid the Loans down by $15 million (after $10 million was used to discharge a tax obligation) but would have left O'Connor in a junior lien position on the Ranch.[54]

On May 24, 2022, Johnson rejected that proposal in an email stating "[w]e remain unconvinced that you are acting expeditiously to take the necessary steps to sell assets."[55] Two days later, the Secured Parties sent Souki a "Reservation of Rights" stating that they were entitled to exercise their rights and remedies under the Loans and Pledge Agreements.[56]

The Secured Parties elected to start a foreclosure process on the Ranch but didn't fully commit to it.[57] Instead, they continued working with the Soukis. In June 2022, Karim wrote to Johnson that the Soukis were committed to paying down majority of the debt and reiterated Souki's five step plan to do so.[58] O'Connor started exercising rights of foreclosure on the Ranch but still remained open to working out a consensual resolution.[59] Johnson also remained open to learning more about Souki's plan to monetize the Souki Shares.[60]

In July 2022, the Secured Parties learned during a videoconference with the Soukis that if they proceeded with the Ranch foreclosure, the Secured Parties would be required under Colorado law to credit bid an amount that represented a good faith estimate of fair market value.[61] Also, after disagreements about enlisting a co-

---

[51] PL. Ex. 261.
[52] Tr. 2 40:15–21; SP. Ex. 136.
[53] Tr. 2 41:9–14.
[54] Tr. 2 322:11–21; SP. Ex. 136.
[55] Tr. 2 325:15–18; SP. Ex. 136.
[56] SP. Ex. 26.
[57] Tr. 2 327:19–328:6, 330:4–12, 332:10–12; SP. Ex. 26.
[58] *See* PL. Ex. 120.
[59] Tr. 2 267:12–19; PL. Ex. 120.
[60] *See* PL. Ex. 120; Tr. 2 268:4–9.
[61] Tr. 1 387:5–388:16; Tr. 2 270:7–9.

broker to work with Souki's son, Christopher, on marketing the Ranch, the parties agreed on new terms around the marketing of the Ranch, which involved enlisting Christie's as a co-broker.[62] The foreclosure was paused soon after.

That same month, the parties entered a prenegotiation agreement.[63] The Lenders agreed to "participate in discussions and negotiations with the borrower parties."[64] Souki stipulated that there was $15,940,666.85 and $106,615,846.57 outstanding under the 2017 and 2018 Loans respectively.[65] And the parties acknowledged that "[e]ach borrower party acknowledges and agrees that the loan documents are and remain in full force and effect, unmodified, enforceable in accordance with their terms. Furthermore, each Guarantor hereby ratifies and confirms its obligations under each Loan Agreement."[66]

Now, recall the September 2020 Note with Souki's brother. In October 2022, Ajax, as borrower, executed a promissory note with the Trust for $11,766,818.65 ("**October 2022 Trust Note**").[67] The collateral under the October 2022 Trust Note included Ajax's commercial real-estate subsidiaries.[68] The October 2022 Trust Note was amended in December 2022 ("**Amended Note**").[69] Under the Amended Note, the Trust agreed to provide a $3 million+ line of credit to Ajax.[70] The Amended Note includes an acceleration clause that was not included in the October 2022 Trust Note.[71] The acceleration clause is triggered if the Secured Parties foreclose on the Ajax Shares, or if Strudel or the Trust stops controlling Ajax or owns less than 50% of membership interest in Ajax (the same interest pledged as Collateral under the Loans).[72] The September 2020 Note was also amended to include a similar event of default.[73]

The parties' negotiations continued late into 2022.[74] In November 2022, O'Connor made a proposal that contemplated a nine-month forbearance period as long as Souki began selling the Souki Shares in the fourth quarter of 2022.[75] Karim countered with a proposal requiring Souki to sell the Shares before August 31, 2023. He then pushed that date out, again, to December 2023, when Souki would arrange

---

[62] Tr. 2 332:1–16.
[63] Tr. 1 243:18–25; Tr. 2 338:10–17; SP. Ex. 201.
[64] Tr. 2 48:2–10; SP. Ex. 201.
[65] Tr. 2 49:23–50:2, 52:9–12; SP. Ex. 201.
[66] Tr. 2 53:2–11; SP. Ex. 201.
[67] Tr. 1 290:12–18; SP. Ex. 58.
[68] Tr. 1 295:17–23; SP. Ex. 63.
[69] Tr. 1 297:22–298:6; SP. Ex. 62.
[70] Tr. 1 297:15–19; SP. Ex. 62.
[71] Tr. 1 298:19–299:1; SP. Ex. 62.
[72] Tr. 1 298:11–18; SP. Ex. 62.
[73] Tr. 1 301:5–302:6; SP. Ex. 59.
[74] *See, e.g.,* Tr. 1 249:9–12, 251:9–253:8; Tr. 2 360:13–18; SP. Ex. 130; SP. Ex. 140; SP. Ex. 142.
[75] Tr. 2 360:13–361:5; SP. Ex. 140.

for "reasonable 10 b 5 sales program."[76] Also included in the counter proposal was a $35 million offer from the Trust on the three remaining households on the Ranch. The Soukis continued to believe the Shares could not be sold without "an extremely negative impact on the value of the Company," and that the Secured Parties should instead focus on the Ranch, where there is "more flexibility."[77] Karim stated that "[u]ltimately O'Connor's full recovery is dependent on [Souki's] success with Tellurian."[78]

The Secured Parties didn't agree this time. They informed Souki in November 2022 that they planned to pursue the Collateral because negotiations at that point had broken down. They believed parties were trying to avoid their obligations under the Loans.[79]

In December 2022, Alvarez and Marsal in the Caymans ("**A&M**") was appointed as director of Ajax Cayman, effectively controlling the entity that owns the Tango.[80] A&M contracted Wally to assist marketing the Tango.[81] The Tango eventually sold for €8 million.[82] O'Connor also sold the Souki Shares from February through April 2023. The Shares were sold on the New York Stock Exchange by members of UBS's trading department.[83] O'Connor sold between 5 and 15 percent of the daily volume with the amount sold depending on the price variation relative to the market open price.[84] The Shares were sold for about $30 million in the aggregate.[85]

In March 2023, Souki sued the Secured Parties in the New York Supreme Court, Commercial Division.[86] The New York Court denied Souki's request for a preliminary injunction against the Secured Parties preventing them from selling Collateral.[87]

In July 2023, the Debtors filed chapter 11 bankruptcy cases in this District. The rest of the Ranch was sold during the Debtors' bankruptcy cases under a Court

---

[76] Tr. 1 268:19–269:2; SP. Ex. 130.

[77] Tr. 1 265:3–12; SP. Ex. 130.

[78] Tr. 1 265:16–19.

[79] *See* SP. Ex. 130 at 5.

[80] Tr. 4 6:1–2, 46:1–4, 47:11–14; SP. Ex. 6.

[81] Tr. 4 32:4–6, 38:16–39:4; *see also* SP. Ex. 5.

[82] Tr. 4 43:9–11.

[83] Tr. 2 373:23–374:6.

[84] Tr. 2 380:9–24; SP. Ex. 101 at 332, 348.

[85] Tr. 3 447:2–4.

[86] *See Souki v. Nineteen77 Capital Solutions A LP*, Case No. 1:23-cv-07982-JGLC (S.D.N.Y. 2023), ECF No. 1.

[87] *See Souki v. Nineteen77 Capital Solutions A LP*, Case No. 1:23-cv-07982-JGLC (S.D.N.Y. 2023), ECF No. 1 (Exhibit 196).

approved auction for $30.5 million.[88] Wilmington, as Administrative Agent on behalf of the Lenders, filed a proof of claim for at least $97 million.

Plaintiffs argue in this lawsuit that the proof of claim should be disallowed because the Secured Parties breached their duty under the New York Uniform Commercial Code to dispose of Collateral in a commercially reasonable manner. Plaintiffs claim, among other things, that the timing of the sale of the Souki Shares was not commercially reasonable under N.Y. U.C.C. §§ 9-610(b) and 9-207 because the Secured Parties could have sold the Shares in May 2022—when they could have paid off the entire debt under the Loans. They also assert that the Secured Parties destroyed the value of the Ranch and disposed the Tango in a commercially unreasonable manner.

The rest of Plaintiffs' claims are:

- Breach of Good Faith and Fair Dealing
- Tortious Interference with Contract against O'Connor
- Breach of Contract
- Declaratory Judgment
- Permanent Injunction
- Equitable Subordination

Plaintiffs also ask the Court to award over $100 million in damages, interest (including prejudgment, postjudgment, and statutory interest), and costs and attorney's fees.

The Secured Parties deny all liability and assert several counterclaims:

- Breach of Good Faith and Fair Dealing
- Breach of Contract
- Fraudulent Transfer
- Aiding and Abetting a Fraudulent Transfer

The Secured Parties also seek declaratory judgment that they are owed at least $100 million.[89]

---

[88] Order Authorizing Sale, No. 23-90757, ECF No. 245.
[89] *See* Answer, ECF No. 64.

## Jurisdiction

This is a core proceeding under 28 U.S.C. § 157(b)(2)(B), (H), (K), and (O). The Court has jurisdiction under 28 U.S.C. § 1334. The parties' implied consent also provides this Court constitutional authority to enter a final judgment under *Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. 665, 678–83 (2015) and *Kingdom Fresh Produce, Inc. v. Stokes Law Off., L.L.P. (In re Delta Produce, L.P.)*, 845 F.3d 609, 617 (5th Cir. 2016).

## Analysis

## I.   The Secured Lenders Disposed Collateral in a Commercially Reasonable Manner.

Plaintiffs argue that the Secured Parties' disposition of the Souki Shares and the Tango was commercially unreasonable. They also believe the Secured Parties destroyed the value of the Ranch. Underlying each of these claims is a claim that the Secured Parties did not act in good faith. The evidence at trial firmly established that Plaintiffs are wrong.

Article 9-610 of the New York UCC says:

> (a) Disposition after default.
>
> After default, a secured party may sell, lease, license, or otherwise dispose of any or all of the collateral in its present condition or following *any commercially reasonable preparation or processing.*
>
> (b) Commercially reasonable disposition.
>
> Every aspect of a disposition of collateral, including the method, manner, time, place, and other terms, must be commercially reasonable. If commercially reasonable, a secured party may dispose of collateral by public or private proceedings, by one or more contracts, as a unit or in parcels, and at any time and place and on any terms.

N.Y. U.C.C. § 9-610(a), (b).

The plain text shows that a secured creditor is not held to a standard of commercial perfection. The standard is commercial reasonableness. And there may be several methods and times to dispose of collateral that are commercially reasonable. That is because the UCC says that secured creditors may dispose of

collateral following "*any* commercially reasonable preparation or processing." But secured creditors can't choose which parts of collateral disposition are commercially reasonable. Every aspect of the disposition must be commercially reasonable. N.Y. U.C.C. § 9-610(b).

The phrase "commercially reasonable" is not defined in the UCC. New York courts hold that commercial reasonableness is determined based "on the totality of the circumstances, including the good faith efforts of the creditor." *F.D.I.C. v. Wrapwell Corp.*, No. 93 Civ. 859 (CSH), 2002 WL 14365, at *9 (S.D.N.Y. Jan. 3, 2002). "Totality of the circumstances" means courts looks at "the aggregate of circumstances . . . rather than specific details of the sale taken in isolation." *In re Zsa Zsa Ltd.*, 352 F. Supp. 665, 670 (S.D.N.Y. 1972), *affd.* 475 F.2d 1393. "The facets of manner, method, time, place and terms cited by the [UCC] are to be viewed as necessary and interrelated parts of the whole transaction." *Id.* at 670. The "virtue of this lack of particularization is that it invites consideration of accepted business practices as a guide to what is most likely to protect both debtor and creditor." *Bankers Tr. Co. v. J.V. Dowler & Co.*, 390 N.E.2d 766, 769 (N.Y. 1979); *see also CCO Condo Portfolio (AZ) Junior Mezzanine, LLC v. Feldman*, No. 21 Civ. 2508, 2022 WL 3867910, at *8 (S.D.N.Y. Aug. 30, 2022). The "customs and usages" that govern the day-to-day relationships of borrowers and lenders illustrate the "standards that are well recognized" and "reflect a practical wisdom born of accumulated experience." *Bankers*, 390 N.E.2d at 769. This is especially true where the parties are "sophisticates who vocationally traffic in the milieu of high finance." *Id*.

The UCC offers more guidance. It provides that a disposition is commercially reasonable if it is made: "(1) in the usual manner on any recognized market; (2) at the price current in any recognized market at the time of the disposition; or (3) otherwise in conformity with reasonable commercial practices among dealers in the type of property that was the subject of the disposition." N.Y. U.C.C. § 9-627(b). When collateral is sold on a "recognized market," the method of disposition is "immune from attack." *Bankers*, 390 N.E.2d at 769. The Official Comments to § 9-610 state that the New York Stock Exchange is a recognized market. N.Y. U.C.C. § 9-610 cmt. 9. Further, when the amount of a deficiency is at issue and the secured party's disposition of collateral has been challenged as commercially unreasonable, the secured party has the burden to prove that the disposition was commercially reasonable. N.Y. U.C.C. § 9-626(a)(2).

"The fact that a better price could have been obtained by a sale at a different time or in a different method from that selected by the secured party is not of itself sufficient to establish that the sale was not made in a commercially reasonable manner." *CCO Condo Portfolio (AZ) Junior Mezzanine, LLC v. Feldman*, No. 21 Civ. 2508, 2024 WL 622098, at *3 (S.D.N.Y. Feb. 14, 2024) (quoting *In re Sackman Mortg. Corp.*, 158 B.R. 926, 936 (Bankr. S.D.N.Y. 1993)). The 2022 *CCO Condo* decision also instructs that if a sale was not commercially reasonable, "it might

affect the amount Defendants [guarantors] must ultimately pay, but it would not change the fact that Defendants would be liable for any shortfall." *CCO Condo Portfolio (AZ) Junior Mezzanine, LLC v. Feldman*, No. 21 Civ. 2508, 2022 WL 3867910, at *6 (S.D.N.Y. Aug. 30, 2022).

The UCC doesn't include a **specific time limit that a secured creditor must sell collateral.** But the **Official Comments to 9-610** provide that if a secured creditor "holds collateral for a long period of time without disposing of it, and if there is no good reason for not making a prompt disposition the secured party may be determined not to have acted in a 'commercially reasonable' manner." N.Y. U.C.C. § 9-610 cmt. 3.

a.    *Sale of the Souki Shares was Commercially Reasonable, in both timing and methodology.*

Plaintiffs allege that the Secured Parties acted in a commercially unreasonable way by electing to foreclose on the Ranch in May 2022 rather than liquidating the Souki Shares.[90] According to Plaintiffs, the Secured Parties controlled the Shares and could have liquidated them at any time. They argue that O'Connor should have sold them between late March and May 2022, when the shares were consistently trading above $4.[91] Plaintiffs allege that 8 months of unreasonable delay passed before the Shares were sold—all so the Secured Parties could accumulate millions of dollars of interest under the Loans.[92]

The Secured Parties counter that they did not sell the Souki Shares until February 2023 because they were working in good faith to reach a consensual solution with Souki about the Loan repayments and the Loans were overcollateralized. And when the Shares were ultimately sold, they developed and implemented a commercially reasonable plan. The evidence proves that the Secured Parties are right. While it may be unfortunate that the sale of the Souki Shares didn't yield enough funds to pay off the Loans, the Secured Parties were commercially reasonable in every aspect of the disposition of Collateral. They didn't hold on to the Collateral for too long. Souki defaulted on over $100 million under the Loans and the Secured Parties worked with him in good faith to consensually get repaid and avoid liquidating Souki's personal assets pledged as Collateral. And for that effort, Plaintiffs sued the Secured Parties.

Starting in 2020, the Lenders entered into Bridge Agreements to give Souki more time to pay his debts. And then when they expired in 2021, the Secured Parties considered Souki's request to not sell the Souki Shares—or allow him to be the seller—and to allow time for Tellurian to achieve FID. The Secured Parties

---

[90] Tr. 4 228:16–229:9.
[91] *See* PL. Ex. 261.
[92] Tr. 1 33:2–9; Tr. 4 237:12–239:13.

could have foreclosed on the Collateral. But they didn't. Instead, they moved forward with the Soukis' luxury rental plan for the Ranch, including using his son as the primary broker.

Throughout 2021, Karim requested that the parties enter a formal forbearance agreement that would include terms preventing O'Connor from selling the Shares and stressed that O'Connor should not sell the Souki Shares.[93] For example, in July 2021 Karim stated "[a]ny premature sales on [Souki's] part … or by O'Connor on his behalf prior to his implementation of the rest of his strategy would have a catastrophic impact on the share price."[94] In the same email, Karim stated that Souki "will be ready to propose an orderly sale of the shares in the second quarter of 2022 to repay any remaining balance."[95] In another proposed forbearance agreement from October 2021, Karim proposed that Souki arrange a sale of the Shares in June 2022.[96] O'Connor rejected those forbearance requests so it could maintain flexibility to pursue the Shares if their value fell and was at risk of being unable to recover.[97]

The record also shows that the parties were still working to sell the Ranch in late 2021 into early 2022. O'Connor's risk book meeting notes from December 2021 indicate that the Ranch sales process had been slow since October 2021 because of seasonality but was expected to pick up in 2022.[98] Karim also testified that he could not attract real estate agents to the Ranch from late 2021 to early 2022.[99] So the plan was to give Souki more time to sell Ranch parcels.[100]

At the end of 2021, O'Connor valued the Collateral at $180 million to $200 million and considered itself overcollateralized.[101] O'Connor estimated the value of the Ranch to be about $95 million and the Souki Shares around $75 million.[102]

Plaintiffs argue that between March and May 2022, the Secured Parties could have sold the Souki Shares and covered Souki's obligations under the Loans.[103] At trial they focused on May 26 as the day the Secured Parties should have sold the Shares. They allege that is not only the day that the Secured Parties made an unreasonable decision to initiate foreclosure on the Ranch instead of the

[93] *See e.g.*, PL. Exs. 53, 78.
[94] Tr. 1 212:9–14; SP. Ex. 148.
[95] Tr. 1 212:23–213:6.
[96] *See* SP. Ex. 120.
[97] *See* Tr. 2 222:4–9, 303:6–11; *see also* PL. Ex. 94 at 4 (Project Chiron).
[98] PL. Ex. 94 at 4 (Project Chiron).
[99] Tr. 1 139:2–6.
[100] *See* PL. Ex. 84 at 3.
[101] PL. Ex. 94 at 4 (Project Chiron).
[102] PL. Ex. 94 at 4 (Project Chiron).
[103] Tr. 4 233:11–24.

Shares but also the time when the Secured Parties allegedly ended their efforts to reach a consensual resolution.[104]

Plaintiffs mainly rely on a series of emails between Karim and Randal Johnson from O'Connor and the Souki Share's price during that time. In May 2022, Karim, on behalf of Souki, sent a proposal that included third-party $25 million first mortgage against the remaining houses on the Ranch.[105] The proposal also provided that "[o]n or before September 30th, 2022, [Souki would] sell a block of stock to generate enough money to discharge 62.6 million plus a 6 percent accrued interest from June 30th unless [he was] restricted under [Tellurian's] guidelines."[106] In other words, the Secured Parties could agree to additional secured debt on the Ranch— and potentially lose their first lien position—*and* agree to a sale of Souki Shares after the period Plaintiffs now allege was the time to sell them.

The evidence shows that O'Connor rejected the May proposal. For example, Johnson emailed "[w]e remain unconvinced that you are acting expeditiously to take the necessary steps to sell assets, including the homes and undeveloped land, in order to achieve this long-overdue repayment in full."[107] Plaintiffs also note that a few days before, O'Connor calculated internally that Souki would accrue around $9 million in interest by the year's end.[108] Then on May 26, Wilmington sent notices commencing the foreclosure process on the Ranch.[109] Plaintiffs contend that at this point the Secured Parties made the commercially unreasonable choice of foreclosing on the Ranch, the more illiquid asset, so they could accrue interest to Souki's detriment.[110]

But Plaintiffs' focus on May 2022 appears strategic and disregards context. The evidence shows that Souki had sophisticated counsel who were copied on emails in 2021 and through November 2022 about proposals to consensually work out a deal.[111] The contemporaneous evidence also shows that there is nothing documented insisting the Souki Shares be sold between March and May 2022, and nobody questioning the Secured Parties' decision to not sell. The testimony and record evidence also shows that both parties wanted to keep working on a consensual deal to repay the Loans without liquidating the Souki Shares.

The argument that the Secured Parties should have foreclosed in May 2022 seems to be a time cherry-picked to focus the Court on a date when Tellurian's stock was trading high. But the parties' communications about trying to work out a deal

---

[104] Tr. 4 231:20–232:2.
[105] PL. Ex. 114.
[106] Tr 2 323:8–11; PL. Ex. 114.
[107] Tr. 2 140:4–16; PL. Ex. 114.
[108] PL. Ex. 112 at 2 (Total Chiron 2.0 and Chiron 3.0 Outstanding Principal + Interest).
[109] *See* PL. Ex. 5.
[110] Tr. 1 33:2–9.
[111] *See e.g.*, PL. Ex. 70; SP. Ex. 130.

didn't end in May. As late as November 2022, Souki was requesting that the
Secured Parties continue to forebear. The reality is that he did not want the Souki
Shares sold. From the beginning, Karim and Souki were worried about the negative
effects that a premature sale of the Shares would have on Tellurian's progress on
Driftwood, FID, and Tellurian's share price.[112] Souki made it clear through his
correspondence with Karim and O'Connor that Tellurian's stock price, and thus the
value of O'Connor's collateral, depended on Tellurian's ability to reach FID.[113] To
get to FID, Souki testified that Tellurian needed to secure long-term contracts with
customers for natural gas to provide the level of financing necessary to get
Driftwood sufficiently underway.[114] But a premature sale of the Shares from
someone other than Souki could scare potential investors and derail the entire
project.[115]

At all times, Souki communicated that he intended to pay back the Loans.[116]
Karim, on Souki's behalf, repeatedly stressed that selling the Shares would harm
Tellurian's value and share price. Karim stated several times—*including in May
2022*—that a premature sale of the Shares would damage Tellurian's share price
and Souki's ability to repay the Loans. For example, in a May 13 email, Souki
explained that it was "critical that [Souki] be the one to sell the shares in a manner
and at a time that it does not hurt the company. Not doing so would destroy the
value of the collateral and would cause enormous damage to all involved."[117] Souki
confirmed that he believed he had to be the one to sell the Shares "if it would be
done without affecting the value of … Tellurian."[118]

Sure, there are other emails showing that O'Connor expressed doubts about
Souki's ability to repay around this time. And there are other communications
showing good-faith negotiations with Plaintiffs. But none of this means that the
Secured Parties acted commercially unreasonably by not selling during this time or
held the Collateral too long. The parties understood that if FID was achieved,
Tellurian's stock price could climb significantly.[119] Media coverage of Tellurian even

---

[112] *See* Tr. 1 106:15–107:2, 212:6–213:8; PL. Ex. 53; SP. Ex. 148. Karim also testified that on October
25 or 26, 2021, he called Johnson and "got very frustrated" because Johnson began inquiring into
when Souki would sell the Souki Shares and Karim "kind of blew up at him" and said "if … you want
the [Shares] sold now, then you do it." But on October 31, 2021, Karim emailed Johnson an article
about Tellurian's progress towards Driftwood and his testimony is that at the time of that email he
was not encouraging the Secured Parties to sell the Shares. It is unclear whether this conversation
occurred as Karim testified. Regardless, it appeared to be an emotional outburst, and not a formal
request to sell. This was not a demand by Plaintiffs to sell the Souki Shares.

[113] *See e.g.*, PL. Ex. 53; SP. Ex. 130 at 14.

[114] Tr. 1 336:5–21.

[115] *See* PL. Ex. 53.

[116] Tr. 1 227:2–7, 320:7–11; Tr. 2 53:16–22, 56:1–5; *see also* SP. Ex. 131.

[117] Tr. 2 319:21–320:12; PL. Ex. 114.

[118] Tr. 2 42:19–43:10. Recall also that the Bridge Agreements required the Lenders to use
commercially reasonable efforts to avoid material disruption to Tellurian's share price.

[119] Tr. 2 284:7–14.

suggested that the company's stock could increase.[120] And, as stated above, the parties were engaged in good faith discussions. The Secured Parties wanted to work with Souki. And he wanted to work with them.

There are cases where courts have found disposing of collateral to be commercially unreasonable. But not on facts like these. Plaintiffs ask the Court to consider the analysis in cases like *Solfanelli v. Corestates Bank, NA.*, 203 F.3d 197 (3d Cir. 2000). In *Solfanelli*, the court applied a similar Pennsylvania UCC statute. That court found that the creditor acted commercially unreasonably when it chose to retain stock held as collateral for 11 months before disposing it at a time when its value couldn't satisfy the debt. *Id.* at 200–02. But that case is not like this case. The Third Circuit noted, among other things, (i) the lender didn't provide a credible reason for holding the stock for 11 months after filing a certificate of default; (ii) the borrower made no request that the lender hold the stock during critical period identified by the court; and (iii) the lender's expert declined to opine about whether the lender's delay was commercially reasonable. *Id.* at 201.

Plaintiffs also rely on their expert, who testified that she would have sold the Souki Shares in the first half of 2022.[121] But she failed to fully consider the nature of secured lending between sophisticated parties, Souki's standing in the LNG industry, and the progress towards FID during that time. She would have disregarded Souki's representations about FID because it was not possible to predict the market or otherwise verify what he was saying.[122] For example, when asked how she would weigh Souki's representations about FID and the negative effects of a premature sale of the Shares, Plaintiffs' expert testified that "I would only give it weight to the degree that I could actually verify that what he was, in fact, telling me was true."[123] Despite the contemporaneous evidence showing the parties were negotiating in good faith, Plaintiffs are now arguing that the Secured Parties shouldn't have listened to them.

The Court found the testimony of Lilly Kaufman key. Kaufman was involved in managing the Loans for O'Connor. She also took part in the strategy on the day to day and the evaluation of the underlying Collateral performance. As part of her work, she performed scenario analyses in connection with the Loans. O'Connor was constantly monitoring the underlying asset performance and conducting scenario analysis based on extraneous factors and conversations with Souki.[124] After Souki defaulted on the Loans, she participated in the negotiations with Souki.[125] She testified that O'Connor considered Souki's views on the Collateral, including his

---

[120] *See* SP. Ex. 35.
[121] Tr. 3 60:4–17.
[122] Tr. 3 58:1–22.
[123] Tr. 3 57:19–21.
[124] Tr. 3 479:3–10.
[125] Tr. 3 480:23–481:1.

views on the disposition of the Souki Shares.[126] She said Souki's opinions—as a chief officer and someone "intimately aware of potential future developments"—carried weight.[127] The Court finds no credible evidence that the Secured Parties intentionally delayed selling the Shares to collect interest payments. Rather, they were trying to work with Souki and get the Loans repaid. And it was not commercially unreasonable to try and to do so.

The Court also found the Secured Parties' expert Stanley Fortgang very credible. He had valuable experience at large investment banking institutions. He testified that it's less about believing Souki and "more about [how] the market is showing us we're going to lose the rest of our money."[128]

Fortgang gave weight to the Secured Parties being overcollateralized in May 2022 and concluded that it was not unreasonable for them to not sell the Souki Shares then.[129] He explained that the analysis should consider the value of the entire collateral package.[130] The goal is to have the loan repaid, not liquidate collateral.[131] In his opinion, that there happened to be a period in 2022 where the Souki Shares could have covered Souki's obligations under the Loans is not material.[132] Rather, he testified that the analysis from a lender's perspective is more focused on when they are at risk of losing their security.[133] To that end, he testified a key factor in a lender's decision making is when they move from being fully collateralized to undercollateralized.[134] And that a consensual resolution is always the optimal outcome.[135]

The evidence shows that the parties were working in good faith and that Tellurian was making progress towards FID.[136] On March 28, Bechtel Energy received a limited notice to proceed with construction of the first phase of Driftwood.[137] Johnson circulated the press release to O'Connor's investment

---

[126] Tr. 3 481:2–8.
[127] Tr. 3 481:6–16.
[128] Tr. 4 137:19–21.
[129] Tr. 4 96:7–16.
[130] Tr. 4 136:20–21.
[131] Tr. 4 131:20–24.
[132] Tr. 4 132:12–19.
[133] Tr. 4 132:20–135:4.
[134] Tr. 4. 138:15–18.
[135] Tr. 4 102:2–8.
[136] This Court's decision is in line with the case *Mass. Mut. Life Ins. Co. v. Gramercy Twins Assocs.*, 606 N.Y.S.2d 158, 160 (N.Y. App. Div. 1993). Although not a case on § 9-610, the court found that a protracted negotiation period is not evidence of bad faith: to "draw a negative inference from the fact that plaintiff kept the negotiations open as long as it did" would be "illogical" because the "length of time accorded defendant to work out its financial difficulties, if anything, is evidence of plaintiff's good faith."
[137] PL. Ex. 102.

team.[138] And, Tellurian's stock price was increasing throughout the March – May 2022 period.

After the Secured Parties started the foreclosure process on the Ranch in May 2022, the parties still tried to come to a consensual solution. According to Johnson, the Secured Parties' plan was to pursue the Ranch through foreclosure unless Souki agreed to different terms about the marketing of the Ranch.[139] In early July 2022, Souki, Johnson, and the Secured Parties' counsel held a Zoom meeting about the Ranch foreclosure.[140] Johnson testified that within a few weeks after that meeting, Secured Parties paused the foreclosure because Plaintiffs agreed to terms about the marketing of the Ranch including bringing on a co-broker.[141] They solidified their commitment to work towards a consensual resolution when they signed a prenegotiation agreement in July.[142] In August, Johnson testified that the Secured Parties thought there was  a "decent chance" FID was achievable and they were still overcollateralized.[143] In September, the parties discussed steps to sell the Souki Shares, specifically Souki's proposal to sell a block of shares from May 2022.[144] Karim also represented that the Ranch was generating interest.[145]

But in November 2022 things changed. Karim and Plaintiffs' counsel sent Johnson counterproposals on behalf of Souki.[146] The counterproposal included that Souki would start a 10(b)(5) sale of the Shares by December 2023.[147] Plaintiffs reiterated that the recovery depended on Tellurian's success.[148]

Johnson testified that he understood this to mean that Souki "was not going to sell shares until it was either a very positive outcome for him or the stock was worthless" and "given where the shares were trading at that point in time, it changed our mind in terms of whether we could continue to wait or not." [149] Johnson responded to Karim's counter proposal that O'Connor was not convinced that Souki would sell the Shares without foreclosing.[150] Johnson testified that after this exchange O'Connor began "exploring exactly what we needed to do in order to get ready to sell the shares" while continuing to have discussion about the Ranch.[151]

---

[138] Tr. 2 232:15–25.
[139] Tr. 2 328:17–22.
[140] Tr. 1 387:6–12; Tr. 2 270:7–9.
[141] Tr. 2 332:1–16.
[142] *See* Tr. 2 48:2–10; SP. Ex. 201.
[143] Tr. 2 350:14–24.
[144] Tr. 1 258:10–19; SP. Ex. 28.
[145] *See* SP. Ex. 28.
[146] SP. Ex. 130.
[147] Tr. 1 268:19–269:2.
[148] Tr. 2 364:1–8; SP. Ex. 130 at 14.
[149] Tr. 2 363:15–22.
[150] *See* SP. Ex. 130 at 12.
[151] Tr. 2 364:19–21.

In late 2022 or early 2023, O'Connor made the decision to foreclose on the Collateral—including the Souki Shares.[152] Ted Drury, UBS O'Connor's Global Head of Trading, testified that Johnson and Kaufman approached him in late December 2022 or January 2023.[153] He testified that there were about three meetings with himself, Johnson, Kaufman, the execution trader, and O'Connor's legal team about how to plan the disposition of the Souki Shares.[154] At these meetings Drury testified that he presented options that would typically be used to execute trades of this type.[155]

Ultimately, the group settled on a percent of volume strategy because they determined it was the option that would impact the share price the least, thereby maximizing value.[156] Drury testified that he considered a block sale but decided against it because the model they used to analyze strategies stated that it would be an infeasible trade and he was concerned with information leakage: revealing the context of the block sale, which Drury testified he would have been ethically obligated to do.[157] He also spoke with a broker about possibly participating in a block trade, but the broker was not interested.[158] O'Connor sold the Shares between February 8, 2023 and April 5, 2023. O'Connor monitored the trades daily.[159]

The NY UCC provides that it may be commercially unreasonable for a secured creditor to hold collateral for a prolonged period and there is "no good reason for not making a prompt decision." N.Y. U.C.C. § 9-610. The Secured Parties didn't hold on to the Souki Shares for too long and there were good reasons for not selling them until February 2023. The parties were still working towards a consensual solution. Souki requested that O'Connor focus on the Ranch so not to jeopardize Tellurian's progress on Driftwood.[160] The evidence showed that Tellurian was making progress towards FID and O'Connor believed it could reach FID.[161] The evidence also revealed that the Secured Parties focused on consensual repayment and not forced liquidation. Souki wanted O'Connor to continue to work with him and not sell the Shares. And there was never a demand to sell the Shares. *C.f. Reich v. Bowery Sav. Bank*, 583 N.Y.S.2d 980, 982 (N.Y. 1992) (finding that the borrower never requested that the secured party sell stock pledge as collateral before it declined in value and noting that the court was unaware of any courts holding that

---

[152] Tr. 2 371:19–23.
[153] Tr. 4 64:11–17.
[154] Tr. 4 64:21–65:4.
[155] Tr. 4 65:2–8.
[156] Tr. 4 66:4–15.
[157] Tr. 4 66:18–68:25.
[158] Tr. 4 67:19–68:3.
[159] *See* SP. Ex. 101.
[160] *See, e.g.*, Tr. 2 319:21–320:12; PL. Ex. 114.
[161] *See* Tr. 2 350:14–24; PL. Ex. 102.

a secured party is liable when the borrower has not made a demand to liquidate the collateral).

So for the reasons stated above, based on the totality of the circumstances the Secured Parties did not act in a commercially unreasonable way by not foreclosing on the Souki Shares in May 2022 or by selling them in early 2023.[162] The law does not require punishing lenders who work in good faith with borrowers who wanted to work with lenders.

The Court also finds that the method of the disposition was commercially reasonable too. Plaintiffs claim that the Secured Parties recklessly dumped the Tellurian shares by using a method that drove the price down by almost 50 percent. The Secured Parties counter that because the Shares were sold on the NYSE, so by default they were disposed in a commercially reasonable manner too.

Tellurian was not a long-term stable stock that suddenly declined. The Tellurian share price was recognized as volatile.[163] For example, the closing price was $1.22/share when the parties entered the Bridge Agreements. The price increased in July 2021 reaching $4.66/share. But then dropped to a low of $2.57/share in August 2021.[164] After the shares increased in the March/May 2022 period, they decreased sharply. And by November 14, 2022 (about the time of the Soukis' November proposal to the Secured Parties), the closing price was $2.77/share.[165]

At first, O'Connor elected to sell 15 percent of the volume of trades.[166] Drury testified that O'Connor believed this level struck the right balance between timely executing the trades and limiting effect on the security.[167] If the stock declined more than 15 percent, O'Connor would stop trading for the day.[168] O'Connor retained flexibility to change protocol throughout the process. On February 9, 2023, Souki filed a Form 13D with the SEC disclosing that Wilmington had taken control of the Shares and began selling on February 8.[169] On February 14, O'Connor received

---

[162] The Court analysis is reflected above and stands on its own. But the Court also notes that some Plaintiffs testified in the New York action that Souki and an O'Connor representative discussed that Tellurian would not be on financial footing until it had sufficient funding in place for Driftwood, announced its FID, and issued a notice to proceed with Driftwood general contractor. They also agreed that reaching those milestones would be the point that selling the Souki Shares would likely not materially disrupt the stock price. And then it would be commercially reasonable to sell the stock to repay the Loan. This is obviously not what's argued in this case.

[163] Tr. 1 113:2–6, 256:18–257:4; Tr. 2 321:8–19; SP. 136; see also PL. Ex. 261.

[164] PL. Ex. 261.

[165] See PL. Ex. 261.

[166] Tr. 4 70:19–23; see SP. Ex. 101 at 348.

[167] Tr. 4 71:1–3.

[168] Tr. 4 71:15–17; see SP. Ex. 101 at 332.

[169] PL. Ex. 438.

news that Bank of America downgraded Tellurian's stock.[170] In response, O'Connor lowered the percent of volume of shares sold to five percent.[171]

One of Plaintiffs' experts testified that a block sale to a group of institutional investors would have been the best method of disposition.[172] He believes that O'Connor went in aggressively at first and then more passive selling at five percent volume.[173] He opined that O'Connor could have recovered more if it sold at a different volume or at an earlier time.[174]

But on cross-examination he conceded that "the determination of the right time for lenders to sell" was "outside the scope of his testimony."[175] He was not opining on whether O'Connor should have sold earlier, or whether it was commercially unreasonable not to.[176] He was also unaware of any investors interested in a block sale of Souki Shares or whether the Secured Parties had the opportunity to sell the Shares as a block the way he suggested in his model.[177] He also didn't conduct a statistical analysis of whether the Secured Parties' selling caused the Shares' value to decrease.[178] The Secured Parties, however, had an expert perform an event study. He opined that O'Connor's trading program did not cause a decline in Tellurian's stock price.[179]

Arguing that the Secured Parties could have conducted the sale differently does not mean that the method of disposition of the Souki Shares was not commercially reasonable. "[T]he fact that a greater amount could have been obtained ... at a different time or in a different method from that selected ... is not of itself sufficient to preclude the secured party from establishing that the ... disposition ... was made in a commercially reasonable manner. N.Y. U.C.C. § 9-627(a). Further, New York law says collateral is disposed of in a commercially reasonable manner when it is sold "at the price current in any recognized market at the time of the disposition." N.Y. U.C.C. § 9-627(b). The Souki Shares were sold on the NYSE which is a recognized market.[180] N.Y. U.C.C. § 9-610 cmt. 9.

---

[170] Tr. 4 73:24–74:7; *see* SP. Ex. 101 at 293.
[171] Tr. 4 74:8–16.
[172] Tr. 3 270:6–17.
[173] Tr. 3 284:3–15.
[174] Tr. 3 297:13–298:6.
[175] Tr. 3 300:3–8.
[176] Tr. 3 300:10–14.
[177] Tr. 3 303:23–304:25.
[178] Tr. 3 313:2–5.
[179] Tr. 4 162:5–163:1.
[180] Tr. 2 374:7–9.

In sum, the Court finds that the Collateral was sold following commercially reasonable preparation and processing. Every aspect of the disposition of the Souki Shares was commercially reasonable, from the timing of the sale to the method.

      b.    *Plaintiffs' Claim for Breach of Duty of Care Fails.*

Plaintiffs also argue that the Secured Parties breached their duty under N.Y. U.C.C. §9-207(a) because the Secured Parties failed to sell the Souki Shares at a time when the proceeds could have covered Souki's obligations under the Loans.

Under § 9-207(a), "a secured party shall use reasonable care in the custody and preservation of collateral in the secured party's possession…." N.Y. U.C.C. § 9-207(a). Reasonable care is determined based on the circumstances. *See, e.g.*, *Grace v. Sterling, Grace & Co.*, 289 N.Y.S.2d 632, 639 (N.Y. 1968). The standard of care required is that of the level of care that would be exercised by a professional in the same vocation. *See id*. at 639–40.

As stated above, every aspect of the disposition of the Souki Shares was commercially reasonable. They also exercised the requisite level of care required under § 9-207(a). Plaintiffs' claim fails.

      c.    *The Secured Parties Did Not Destroy the Value of the Ranch.*

In helping manage the Loans at O'Connor, Lilly Kaufman performed work related to the Ranch. In mid-2022, she contacted several brokers in the Aspen market.[181] O'Connor wanted to engage a third-party to aid Souki's son, Christopher, in marketing the Ranch. Kaufman testified that enlisting a co-broker was "maybe something that would invigorate the sale strategy, a fresh set of eyes…."[182] Discussions with potential brokers were confidential.[183] O'Connor didn't mention the Ranch or the potential foreclosure until the broker signed an NDA.[184] O'Connor ultimately engaged Christie's, who signed a confidentiality agreement.[185]

O'Connor also spoke confidentially with other property managers.[186] O'Connor believed they lacked information from the Soukis.[187] One area was the HOA budget, which Kauffman testified ran about $4 million per year.[188] Again,

---

[181] Tr. 3 483:23–484:8.
[182] Tr. 3 485:13–14.
[183] Tr. 3 485:21–486:3.
[184] Tr. 3 486:20–487:1.
[185] Tr. 3 485:15–20, 486:4–8.
[186] Tr. 3 487:2–6, 488:2–4.
[187] Tr. 3 487:11–16.
[188] Tr. 3 487:11–16.

there were no discussions about a potential foreclosure of the Ranch until an NDA was signed.[189]

Plaintiffs argue that seeking additional brokers itself was a negative sign to the Aspen market.[190] They believe O'Connor's actions undermined the credibility of the sales process and the Ranch's reputation. The Court rejects this argument. The Secured Parties used Christopher Souki as the primary broker for considerable time, but it did not result in full repayment and sales stalled. The record is void of meaningful evidence to establish this claim. In fact, the opposite is true. Seeking more information from real estate experts in the Aspen area, and getting an NDA before discussing a potential foreclosure, proves that O'Connor was acting reasonably.

The Soukis can't have it both ways. For the Souki Shares, they now argue the Secured Parties shouldn't have listened to their request not to sell the Souki Shares. But for the Ranch, they argue that value was destroyed because the Secured Parties didn't follow their plans. In any case, there is no meaningful evidence that the Secured Parties destroyed the Ranch's value. Every aspect of the disposition of the Ranch was commercially reasonable.

      d.     *Sale and Manner of Disposition of the Tango Were Commercially Reasonable.*

Plaintiffs argue that the sale of the Tango was per se unreasonable because they excluded Souki from the marketing and sale process. This claim fails for several reasons.

The Tango is a Wally Cento racing yacht.[191] Souki helped design the Tango.[192] It is a unique yacht in a niche market. You can't just go buy one anywhere. Souki bought the Tango in 2018 for $17 million or €15 million.[193] He spent $1 million to $2 million a year to maintain it and raced it with a team across the world.[194] For Souki, the Tango was a passion.[195]

Souki didn't provide O'Connor information about Tango's whereabouts.[196] So O'Connor had to resort to other means. Kaufman independently found a website

---

[189] Tr. 3 488:2–9.
[190] *See* Tr. 4 258:8–13.
[191] Tr. 2 73:10–12.
[192] Tr. 1 394:3–6.
[193] Tr. 2 80:16–19.
[194] Tr. 1 393:19–22.
[195] Tr. 1 393:9–11.
[196] Tr. 3 490:13–14.

that tracks vessels, including the Tango.[197] She tracked the vessel as it moved from Monaco to Saint Tropez, to Cannes every other day or so.[198]

In October 2022, the Tango was in the Cayman Islands and stopped moving.[199] O'Connor hired an A&M team based out of the Cayman Islands to provide expertise and assist.[200] The A&M team had substantial expertise with the disposition of vessels. [201]A&M was eventually appointed as receiver. In December 2022, the Secured Parties took control of Ajax Cayman, which effectively meant taking control of the company that owned the Tango. They found the Tango in a shipyard, completely dismantled.[202] In consultation with qualified structural engineers, the ship captain, and A&M, O'Connor had the vessel put back together and marketed for sale.[203] The Secured Parties estimate they paid the shipyard about $2 million to put the vessel back together.[204]

The sale of the Tango ultimately closed around May 2023.[205] Barry Lynch, managing director of A&M, was appointed as a receiver and as a director of the Tango.[206] He sent letters to Souki requesting information about the Tango and to schedule meetings to discuss operations.[207] Lynch testified that he spoke with Souki, but Souki never provided all the information requested in the letters.[208] Eventually, Lynch stopped trying to communicate with Souki.[209]

A&M worked with Wally Brokerage to market and sell the Tango.[210] Wally Brokerage provided an €8 million comparable vessel sale.[211] Lynch also talked to the previous owner of that vessel.[212] The previous owner's understanding was that the €8 million was a reasonable price for the Tango.[213] Ultimately, Lynch received an offer for €8 million which Wally Brokerage felt was market value.[214]

---

[197] Tr. 3 490:25–491:14.
[198] Tr. 3 490:16–18.
[199] Tr. 3 491:4–9.
[200] Tr. 3 492:10–11.
[201] Tr. 3 492:12–16.
[202] Tr. 3 493:1–10.
[203] Tr. 3 493:9–494:3.
[204] Tr. 3 507:8–11.
[205] Tr. 3 490:1–2.
[206] Tr. 4 9:2–11.
[207] Tr. 4 14:1–9; SP. Ex. 6.
[208] Tr. 4 14:20–15:2.
[209] Tr. 4 58:17–20.
[210] Tr. 4 26:5–14.
[211] Tr. 4 37:9–38:6; SP. Ex. 5.
[212] Tr. 4 40:4–18.
[213] Tr. 4 40:2–18.
[214] Tr. 4 26:20–27:5, 43:1–11.

At trial, Souki opined that the replacement value of the Tango was $25 million.[215] He based this valuation on his experience and from talking to yacht owners on the racing circuit. The Court gave little weight to this testimony.

The evidence established that, based on the totality of the circumstances, the Secured Parties disposed of the Tango in a commercially reasonable manner. They tried to work with Souki, who was not very helpful and obstructed efforts to locate the Tango. The Secured Parties had to find the Tango using a website that tracks yachts. Wally constructed the Tango, and Wally Brokerage assisted in the sale. The Secured Parties acted in good faith. Every aspect of the disposition was commercially reasonable. Plaintiffs' claim that the sale of the Tango was commercially unreasonable fails.

  e. *Plaintiffs' Ajax Shares Claim Fails.*

Plaintiffs also argued that the Secured Parties were commercially unreasonable under § 9-610 because they set an auction for the Ajax Shares when, allegedly, it would force the company into bankruptcy.

The Ajax Shares have not been sold.[216] There was not even close to sufficient evidence to show that Ajax would be forced into bankruptcy. Such speculation does not establish this claim.

## II. No Party Breached an Implied Duty of Good Faith and Fair Dealing.

Both parties' claims for breach of an implied duty of good faith and fair dealing are denied.

New York law implies a duty of good faith and fair dealing in every contract. ~~spoke with~~ *Nat'l Mkt. Share, Inc. v. Sterling Nat'l Bank,* 392 F.3d 520, 525 (2d Cir. 2004). The duty "comprises 'any promises which a reasonable person in the position of the promisee would be justified in understanding were included [in the contract].'" *Id.* (quoting *Dalton v. Educ. Testing. Serv.*, 663 N.E.2d 289, 291 (N.Y. 1995)). The implied covenant prevents parties from "do[ing] anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Brown v. Erie Ins.*, 172 N.Y.S.3d 299, 301 (N.Y. App. Div. 2022). "Absent a connection to an express or presumed contractual right or obligation, the doctrine 'does not import a generalized code of good conduct into the law of contracts.'" *Cambridge Cap. LLC v. Ruby Has LLC,* 565 F. Supp. 3d 420, 456 (S.D.N.Y. 2021) (quoting *Scottsdale Ins. v. McGrath,* 549 F. Supp. 3d 334, 353 n.6 (S.D.N.Y. 2021)).

---

[215] Tr. 1 399:6–8.

[216] *See* Tr. 3 532:7–15.

Plaintiffs argue the Secured Parties interfered with Plaintiffs' attempts to repay the Loans by, among other things, (i) objecting to prospective buyers of the Ranch; (ii) objecting to the list prices; (iii) refusing to engage in discussions about release prices; (iv) reneging on assurances made about how the Ranch would be operated for prospective buyers; and (v) rejecting a proposal for $25 million re-financing (which could have placed the Secured Parties in a worse position with respect to the Collateral). The evidence at trial confirmed otherwise. As described above, the Court finds that the Secured Parties acted in good faith throughout their negotiations and renegotiations with Plaintiffs. The Secured Parties had the legal right to foreclose on the Collateral. They didn't agree to all the Soukis' demands with respect to the Ranch. But good faith disagreements don't equal breaches of an implied duty good faith and fair dealing. "[T]he implied covenant does not extend so far as to undermine a party's general right to act on its own interests in a way that may incidentally lessen the other party's anticipated fruits of the contract." *Thyroff v. Nationwide Mut. Ins.*, 460 F.3d 400, 408 (2d Cir. 2006) (citation omitted).

The Secured Parties, in turn, argue that Plaintiffs breached their implied duty of good faith and fair dealing by commencing a lawsuit in New York, opposing the foreclosure on the Ranch, and filing this adversary proceeding. The Court rejects this argument as well. Plaintiffs had a legal right to file their lawsuits in New York and before this Court. Parties can disagree about whether the sale of Collateral was commercially reasonable. But suing over it does not breach the duty here.

### III. The Secured Parties' Breach of Contract Claim Establishing $100 Million Outstanding Debt Stands; Plaintiffs' Claims Do Not.

Under New York law, there are four elements for a breach of contract claim: (1) the existence of a contract; (2) plaintiff's performance under the contract; (3) defendant's breach of contractual obligations; and (4) damages caused by the defendant's breach. *See 34–06 73, LLC v. Seneca Ins.*, 39 N.Y.3d 44, 52 (N.Y. 2022).

Plaintiffs argue that the Secured Parties breached § 4.3 of the Bridge Agreements that required them to "use commercially reasonable efforts to avoid any material disruption of Tellurian's stock price during such process." This claim fails for the reasons discussed above. The Secured Parties did not breach any agreements with any Plaintiff, acted in good faith throughout their negotiations and renegotiations with Plaintiffs—who wanted to negotiate with them too, and every aspect of the disposition of Collateral was commercially reasonable.

The Secured Parties, in turn, argue that Souki, in his capacity as borrower, and Strudel, AVR, and the Trust, in their capacity as Guarantors under the Loans, owe the Secured Parties no less than $100 million for defaulting on their contractual obligations. Both parties acknowledge that the Loans, Pledge

Agreements, and corresponding deeds of trust, as well as the Bridge Agreements and Control Agreement, are valid and binding agreements. The Bridge Agreements expired, and there is no applicable forbearance period in effect. There is also no dispute that Souki has not repaid the Loans.[217] This lawsuit doesn't eliminate any debt owed by Plaintiffs to the Secured Parties. Borrower and guarantors are liable under the Loans.

Jeffery Rose, the Vice President of Wilmington, testified about the amount due under the Loans.[218] The debt schedule for the 2017 Loan showed that as of July 26, 2023, there was $14,495,908.11 in principal outstanding.[219] There is also $3,402,511.74 in accrued interest under the 2017 Loan.[220] The interest was calculated from the last payment date, October 15 2021, through July 27, 2023 using the applicable rates under the 2017 Loan.[221] There is also $76,533,989.33 in principal and $2,519,243.82 in accrued interest outstanding under the 2018 Loan.[222] The interest was calculated from the last payment date, May 9, 2023, using the applicable rate under the 2018 Loan.[223]

Based on the evidence, Souki, in his capacity as borrower, and Strudel, AVR, and the Trust, in their capacity as Guarantors under the Loans, owe the Secured Parties at least $100 million. This amount of damages owed to the Secured Parties does not include a potential reduction for proceeds of the Ranch sold during these chapter 11 cases.

The Secured Parties also allege a breach under § 6.5 of the Loans. Recall that Strudel and the Trust are parties to the October 2022 Note and the Amended Note. The Amended Note was executed in December 2022, shortly before the Secured Parties took control of the Tango in the Cayman Islands.[224] The 50% interest in Ajax Holdings is what Souki pledged as Collateral under the Loans.[225] Functionally, the acceleration provisions included in the Amended Notes triggered if the Secured Parties exercised rights to foreclose on the Ajax shares.[226] The September 2020 Note was also amended to include a similar event of default.[227] Karim testified that the Soukis were concerned that O'Connor would "not make good on debts that were owed and [his] uncle was asking for more protection."[228] The extra debt and

---

[217] Tr. 1 320:3–6, 350:1–8.
[218] Tr. 2 159:2–3.
[219] *See* SP. Ex. 386; Tr. 2 173:4–5.
[220] *See* SP. Ex. 386; Tr. 2 174:7–10.
[221] Tr. 2 174:7–175:4.
[222] SP. Ex. 387; Tr. 2 178:19–21, 179:7–8.
[223] SP. Ex. 387; Tr. 2 179:15–18, 179:21–22.
[224] Tr. 1 298:1–6.
[225] Tr. 1 298:7–10.
[226] Tr. 1 298:11–14.
[227] Tr. 1 301:5–302:6; SP. Ex. 59.
[228] Tr. 1 300:14–24.

acceleration clauses didn't exist when Souki executed the Loans or related Pledge Agreements.[229]

The Secured Parties believe this impairment violated § 6.5(c) of the Loans, under which Strudel and the Trust covenanted not to "[t]ake (or consent or agree to) any [] action that could impair the value of any Collateral or the Administrative Agent's (on behalf of the Secured Parties) security interest therein or their ability to sell or otherwise realize against such Collateral."[230] Plaintiffs countered by arguing that the debt extended under the Notes preserved the value of Ajax and allowed it to continue to exist as a going concern.[231] Karim testified that he could not recall a single year when Ajax didn't require capital infusions from the Trust or Souki.[232] And that if Ajax didn't sustain itself, then AVR wouldn't have been able to sustain itself because Ajax wouldn't have the personnel to manage AVR.[233]

While an $11.7 million note is material, and the timing of the Amended Note is suspicious, there was not enough evidence to establish that the Amended Notes and related debt documents constituted a breach under § 6.5(c) of the Loans. So it is denied.

## IV. There is No Viable Tortious Interference Claim Against O'Connor.

Plaintiffs claim that O'Connor tortiously interfered with the Loans and related contracts by, among other things, advising the Secured Parties to sell the Souki Shares or otherwise causing the Tellurian share price to drop.

Under New York law, there are five elements for a tortious interference with contract claim: "(1) 'the existence of a valid contract between the plaintiff and a third party'; (2) 'the defendant's knowledge of the contract'; (3) the 'defendant's intentional procurement of the third-party's breach of the contract without justification'; (4) 'actual breach of the contract'; and (5) 'damages resulting therefrom.'" *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 401–02 (2d Cir. 2006) (quoting *Lama Holding Co. v. Smith Barney Inc.*, 668 N.E.2d 1370, 1375 (N.Y. 1996)).

Plaintiffs' tortious interference allegation against O'Connor relies on this Court finding that O'Connor engaged in bad faith or other misconduct. For the reasons stated above, there is no meaningful evidence in the record to support this claim. In fact, the record confirms the opposite. O'Connor acted in good faith

---

[229] Tr. 1 298:15–18; *see also* similar amendment to related debt documents SP. Ex. 59 and Tr. 1 300:24–302:6.
[230] *See* SP. Exs. 386–87 at § 6.5(c).
[231] Tr. 1 313:3–6.
[232] Tr. 1 313:6–16.
[233] Tr. 1 313:17–21.

throughout the relevant time periods. The Court finds no malice or illegal conduct about the Souki Shares or in the Secured Parties' negotiations with Plaintiffs.

## V.      Plaintiffs' Claim for Declaratory Judgment and Related Injunctive Relief are Denied.

Plaintiffs seek declaratory judgment that their obligations to the Secured Parties have been paid in full, that all liens and security interests in the Collateral have been released, and that Secured Parties have no right to foreclose on any other Collateral. Plaintiffs believe that if Secured Parties acted in a commercially reasonable manner, the Collateral the Secured Parties seized would have satisfied all obligations under the Loans and paid them in full. And because the Loans should be satisfied, the Secured Parties have no legal right to foreclose on any other Collateral.

Federal courts may declare the rights and other legal relations of a party seeking declaration under 28 U.S.C. § 2201(a). New York law also permits courts to "render a declaratory judgment having the effect of a final judgment as to the rights and other legal relations of the parties to a justiciable controversy whether or not further relief is or could be claimed." N.Y. C.P.L.R. § 3001.

For reasons stated above, the Court finds that the Secured Parties disposed of the Collateral in a commercially reasonable manner under applicable New York law. Plaintiffs' claims for declaratory judgment and related injunctive relief are denied.

## VI.     Plaintiffs' Claims for Equitable Subordination and Disallowance of the Secured Parties' Claims are Denied.

Plaintiffs allege that the Secured Parties engaged in egregious conduct in disposing of the Souki Shares, and that any debt owed to the Secured Parties should be equitably subordinated to the claims of unsecured creditors under § 510(c) of the Bankruptcy Code. Equitable subordination "is an unusual remedy which should be applied only in limited circumstances . . . the doctrine is remedial, not penal, and should be applied only to the extent necessary to offset the specific harm that the creditors suffered on account of the inequitable conduct." *Matter of Fabricators, Inc.*, 926 F.2d 1458, 1464 (5th Cir. 1991).

The Court has already found that the Secured Parties acted in good faith. There is no evidence that the Secured Parties engaged in any egregious fraud, illegal conduct, or breach of fiduciary duties in connection with their disposition of the Souki Shares or the disposition of any other Collateral that even comes close to considering equitable subordination. The Secured Parties have a legally enforceable

claim for at least $100 million. Plaintiffs' equitable subordination and disallowance claims fail.

## VII.   The Secured Parties' Fraudulent Transfer Claims are Denied.

The Secured Parties allege that Souki, Strudel, and the Trust impaired the value of the Collateral through the October 2022 Note, a related Pledge Agreement, and Amendment Note. They also allege that such impairment constitutes a fraudulent transfer under New York law.

Under N.Y. Debt. & Cred. Law § 273:

A transfer made or obligation incurred by a debtor is voidable as to a creditor... if the debtor made the transfer or incurred the obligation:

(1) with actual intent to hinder, delay or defraud any creditor of the debtor; or

(2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

(i) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

(ii) intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

When considering actual intent, courts may consider several badges of fraud, such as whether the transfer was to an insider, the debtor retained control post-transfer, "the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred[,]" and the debtor was insolvent before or right after the transfer. N.Y. Debt. & Cred. Law § 273(b). The creditor bringing an actual or constructive fraudulent transfer claim must prove the elements by a preponderance of the evidence. N.Y. Debt. & Cred. Law § 273(c).

This claim fails for several reasons. First, the Secured Parties didn't satisfy their burden to establish that the trustees acted with actual intent to hinder, delay, or defraud the Secured Parties. They also didn't establish with sufficient evidence a constructive fraudulent transfer claim. While perhaps there was a "transfer" or "obligation" for less than reasonably equivalent value, there is insufficient evidence in the record for the Court to find that it was made or incurred while a party: (i) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or (ii) intended to incur, or believed or reasonably should have

believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due. Thus, this claim fails as a matter of law.[234] And so does the Secured Parties' related aiding and abetting fraudulent transfer claim.[235]

## <u>Conclusion</u>

For the reasons stated above:

1.      It is ORDERED that each of Plaintiffs' claims and causes of action in this Adversary Proceeding are denied.

2.      The Court finds and declares that Souki, in his capacity as borrower, and Strudel, AVR, and the Trust, in their capacity as Guarantors under the Loans, owe the Secured Parties at least $100 million. This amount of damages does not include a potential reduction for proceeds of the Ranch sold during these chapter 11 cases. It is so ORDERED.

3.      It is ORDERED that, except as provided in paragraph 2 above, all other claims and causes of action asserted by the Secured Parties in this Adversary Proceeding are denied.

4.      The Court retains jurisdiction to interpret and enforce this Memorandum Decision and Order.

Signed:  June 28, 2024

_____

Christopher Lopez

United States Bankruptcy Judge

---

[234] The Secured Parties' fraudulent transfer claims also appeared to include causes of action held by the Debtors, which raises standing issues (e.g. Debtor Strudel making a transfer or incurring an obligation). The Court's finding of fact and conclusions of law here are without prejudice to the Debtors' right to assert derivative claims that are property of the Debtors' estates.

[235] There are also cases holding that there is no cause of action for aiding and abetting a fraudulent transfer under New York law against Plaintiffs. *See, e.g., BBCN Bank v. 12th Ave. Rest. Grp.*, 55 N.Y.S.3d 225, 226 (N.Y. App. Div. 2017)*; In re Parker*, 399 B.R. 577, 580–81 (Bankr. E.D.N.Y. 2009). In any case, there is no actionable claim for it here.